UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TRACYE BENARD WASHINGTON,<br><br>    Plaintiff,<br><br>    v.<br><br>C. ESSEX, et al.,<br><br>    Defendants. | No.  2:12-cv-03054 JAM DB<br><br>FINDINGS AND RECOMMENDATIONS |

Plaintiff is a state prisoner proceeding pro se and in forma pauperis with a civil rights action under 42 U.S.C. § 1983 alleging defendants involuntarily medicated him with psychotropic drugs in violation of his Fourteenth Amendment due process rights.  Before the court are defendants Banyas and Essex's motions for summary judgment.  (ECF Nos. 63; 64.)  For the reasons outlined below, the undersigned respectfully recommends that defendants' motions be denied.

**I.      Background**

    **A.      Procedural**

Plaintiff is currently proceeding on his original complaint against defendants.  (ECF No. 1.)  At the screening stage, then-Magistrate Judge Dale A. Drozd found one potentially cognizable claim: That defendants Banyas and Essex involuntarily medicated plaintiff in violation of his Fourteenth Amendment due process rights.  (ECF No. 9 at 2.)

Defendants Banyas and Essex are independently represented and each filed their own motion for summary judgment. (ECF Nos. 63; 64.) Plaintiff filed an omnibus response in opposition to the motions. (ECF No. 68.)[1] Defendants filed replies in support of their motions. (ECF Nos. 66; 67.) The summary judgment motions are now ripe for review. The undersigned will address both motions for summary judgment in this omnibus findings and recommendations.

**B.**     **Factual**

The below statement of facts is derived from the parties' statements of undisputed facts, oppositions to the statements of undisputed facts, the allegations in plaintiff's complaint, and the declarations, depositions and other records submitted for the court's consideration on this summary judgment motion. (ECF Nos. 1; 63-2; 63-3; 63-6; 63-7; 64-1; 64-2; 64-3; 64-4; 64-5; 66; 67; 68.)

Plaintiff has a long documented history of mental health issues. He has been diagnosed with mood disorders, schizoaffective disorder, and paranoia. He has a family history of schizoaffective disorder. Plaintiff has admitted to several suicide attempts, including in 2006, 2007, and 2009. On eight separate occasions while in prison, plaintiff has been recommended for placement to a Mental Health Crisis Bed (MHCB) facility. Additionally, on several occasions, plaintiff has been placed in administrative segregation (Ad-Seg) and on suicide watch after admitting suicidal and violent thoughts to clinical staff and correctional officers.

Plaintiff is currently serving a sentence of 45 years to life for a third strike offense of making terrorist threats to neighbors. Plaintiff's previous offenses include armed robbery, shooting at an uninhabited dwelling, assault with firearm on person, armed robbery, attempted

////

---

[1] Plaintiff's opposition was purportedly mailed and served on defendants on June 27, 2016. (ECF No. 65 at 1.) However, the opposition was not filed with the court until July 28, 2016. (ECF No. 68.) Accordingly, the opposition was filed on the record after defendants submitted their reply memoranda. (See ECF Nos. 66; 67; 68.) Given plaintiff's pro se status and the fact that defendants have not objected to the timing of the opposition, the court deems the opposition as timely filed. Additionally, the undersigned notes that defendants' motion for extension of time to file reply memoranda expressly states that they received the opposition from plaintiff before drafting their replies. (ECF No. 65 at 1.)

1  murder, and attempted assault with a firearm on a peace officer.  While in prison, plaintiff has
2  been charged with rules violations for three violent incidents, the last of which occurred in 2007.
3       On March 16, 2012, plaintiff was transferred from California State Prison-Sacramento
4  (CSP-Sac) to the California Medical Facility (CMF)/Department of State Hospitals-Vacaville
5  (DSH-V), Acute Psychiatric Program (APP) for lack of participation in programming, depression,
6  and suicidal thoughts.  Plaintiff had a prior admission to the APP from December 2, 2011 through
7  January 13, 2012 for the same medical reasons.  The previous stay at the APP concluded when
8  staff determined that plaintiff had reached maximum benefit because he refused to leave his cell
9  or communicate with clinical staff.
10      At all times relevant to the complaint, defendant Essex was employed by the State of
11 California, Department of State Hospitals, as a staff or senior psychiatrist at the APP and
12 Intermediate Treatment Program (ICP) at CMF/DSH-V.  Defendant Banyas was also employed as
13 a psychiatrist at the APP during the relevant time period.
14      Upon admission to APP, patients begin their program with a limited selection of items or
15 issue that is determined by the treatment team.  Such determinations are based on the initial
16 clinical assessment of the patient's safety, including history and/or the patient's behavior during
17 the hospital stay.  A non-tear smock (NTS) shall be initially considered and issued clinically
18 indicated for patient safety. Clinical assessments for safety are ongoing.
19      Inmate patients are referred to the APP when their sending institution feels that they need
20 evaluation/stabilization. APP is a short stay program. The program is designed to assess and
21 stabilize the inmate/patient's symptoms.  DSH-V APP patients are admitted from any CDCR
22 institution or DSH program.  Patients have likely experienced more variations in therapy options,
23 and therefore require more individualized evaluation and treatment.  All patients admitted to VPP
24 are assessed for suicide risk at time of referral, admission, and throughout the course of treatment.
25 The assessments review individual clinical information, including personal history of suicide
26 attempts and other factors.  Following initial reviews, all staff observe patients for behavioral
27 changes that may indicate a risk of suicide.
28 ////

3

On March 16, 2012, defendant Banyas performed an initial psychiatric evaluation and prepared a preliminary treatment plan. Defendant Banyas noted that plaintiff remained agitated and frustrated that he had been transferred to the APP. It was noted that plaintiff was resisting the clinical interview. Eventually, plaintiff refused to answer further questions and chose to remain mute. Defendant Banyas diagnosed plaintiff with major depressive disorder with psychotic features, and antisocial personality disorder.

At the time of admission, plaintiff presented as angry and agitated and was adamant that he would not participate in the program. Plaintiff also declined any medications and would not allow his vital signs to be assessed. During his examination, plaintiff denied being suicidal. However, plaintiff admitted that he had suicidal thoughts since he was nine years old. He also told defendant Banyas that he had attempted suicide twice, in 2006 by hanging himself and 2007 by cutting his wrists.

On March 16, 2012, defendant Banyas placed plaintiff on suicide precaution for 24 hours. On March 17, 2012, defendant Banyas renewed the suicide precaution order for another 24 hours. Defendant Banyas also prescribed the following medications: Prozac, Vistaril for anxiety and insomnia, Tylenol, brimonidine tartrate eye drops, calcium carbonate, xopenex for asthma, and naproxen for chronic joint pain. These medications were prescribed for plaintiff's chronic conditions: Gastroesophageal reflux disease (GERD), glaucoma, chronic arthritis, and asthma.

On March 18, 2012, plaintiff refused three separate cell searches; one at 8:00 AM, one at mid-shift, and one at lunch time. Inmates who are under suicide precaution orders are required to submit to a cell check four times a day, for their own safety, so that Medical Technical Assistants (MTAs) may determine that no dangerous materials are present in the cell. At approximately 11:45 AM, plaintiff began yelling, kicking his cell door, and screaming. Plaintiff also refused to give up his meal trays and threatened staff who came in to do his cell search. Plaintiff eventually defecated in his cell and smeared feces on the wall, door, and windows. He also smeared food on the walls and urinated on the floor.

Plaintiff was then extracted from his cell for his own safety, cuffed and brought into the day room for evaluation by defendant Essex and nursing staff. Defendant Essex's examination

confirmed defendant Banyas' prior diagnosis of major depression with psychotic features and antisocial personality disorder. Defendant Essex also observed that plaintiff exhibited aggressive behavior, was uncooperative and in addition to refusing to take psychotropic medication, plaintiff refused to take his chronic care medication for glaucoma, arthritis, GERD and asthma. Plaintiff refused cooperation with staff at the APP until he was returned to CSP-Sac. In his progress notes, defendant Essex noted that plaintiff's risk for violence was high in view of his current behavior, history of intentional wounding of law enforcement officers (in incidents that all occurred before 2007) and an escape from a forensic hospital in 1989.

At 12:30 PM, on March 18, 2012, defendant Essex ordered the following emergency medication to be administered involuntarily to plaintiff: five (5) mg of Haldol and two (2) mg of Ativan to be administered intramuscularly to plaintiff. Defendant Essex also ordered fifty (50) mg of Benadryl, to be administered orally to plaintiff to counteract any potential side effects to the Haldol and Ativan. At 2:20 PM, on March 18, 2012, defendant Essex ordered that one (1) mg of Cogentin be administered either orally or by injection to plaintiff, every four (4) hours as needed, for extra-pyramidal side effects (dystonic reaction).

At 8:30 PM, defendant Essex met with plaintiff again. Defendant Essex noted that plaintiff was exhibiting less aggressive and angry behavior, but was complaining about somatic pain. Plaintiff anticipated that he would receive an additional injection, but defendant Essex determined that plaintiff could be housed without additional medication. Defendant Essex did order fifty (50) mg of Chlorpromazine, to be administered intramuscularly, every four (4) hours, as needed, for aggressive, assaultive, severely disruptive and self-injurious behavior. This order was valid for forty-eight (48) hours. Defendant Essex also ordered that plaintiff's vital signs be checked every sixty (60) to ninety (90) minutes after each injection and that if plaintiff's somatic complaints persist or worsen, then plaintiff should be referred to an advanced nurse practitioner or physician in the morning. Defendant Essex noted that plaintiff did not appear to be in pain. After the initial injection at approximately 12:30 PM, plaintiff was not medicated again on March 18, 2012. Defendant Essex also noted that as a result of emergency medications physical restraints were avoided.

On March 19, 2012, Defendant Banyas resumed plaintiff's care, as his treating psychiatrist. Defendant Banyas discontinued suicide precautions on March 19. During the remainder of the program, plaintiff refused all medications, medical interventions, declined assessments and requests for clinical check-ins. Further, plaintiff informed the Interdisciplinary Team that he would not be cooperating with the program for the remainder of his stay.

Between March 24, 2012 and March 29, 2012, plaintiff was monitored, during which time he refused all medications and treatment, including the evaluation of vital signs. On March 30, 2012, defendant Banyas saw plaintiff and noted that plaintiff had been non-compliant with medications and treatment rules. Numerous attempts were made by defendant Banyas and the treatment team to evaluate plaintiff, but he refused to leave his cell. Between March 31, 2012 and April 2, 2012, plaintiff was noted to not have any physical complaint, but remained non-compliant with treatment and medications.

On April 4, 2012, plaintiff was seen by the treatment team after he was observed smearing food on his cell door. It was noted that plaintiff's cell was already "filthy" and had garbage and food spread on the floor. Despite initial resistance, plaintiff eventually complied to being cuffed and brought to the treatment room. In the treatment room, he was seen by defendant Banyas. Plaintiff became agitated during this encounter and refused cooperation. Defendant Banyas ordered that plaintiff be involuntarily administered five (5) mg of Haldol and twenty-five (25) mg of Benadryl. Plaintiff was then returned to his cell and monitored.

On April 11, 2012, defendant Banyas interviewed plaintiff who remained adamant that he did not belong at the facility and wanted to return to CSP-Sac as soon as possible. However, plaintiff continued to refuse medications and did not want to participate in the unit program. On March 19, 2012, plaintiff was discharged and transferred to the prison's enhanced outpatient program. Due to plaintiff's anger and frustration tolerance issues, the treatment team recommended that suicide risk assessment occur on a regular basis.

## II. Legal Standard for Summary Judgment

Summary judgment is appropriate when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary

1  judgment avoids unnecessary trials in cases in which the parties do not dispute the facts relevant
2  to the determination of the issues in the case, or in which there is insufficient evidence for a jury
3  to determine those facts in favor of the nonmovant. Crawford–El v. Britton, 523 U.S. 574, 600
4  (1998); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-50 (1986); Nw. Motorcycle Ass'n v.
5  U.S. Dep't of Agric., 18 F.3d 1468, 1471-72 (9th Cir. 1994). At bottom, a summary judgment
6  motion asks whether the evidence presents a sufficient disagreement to require submission to a
7  jury.

8        The principal purpose of Rule 56 is to isolate and dispose of factually unsupported claims
9  or defenses. Celotex Cop. v. Catrett, 477 U.S. 317, 323-24 (1986). Thus, the rule functions to
10 "'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for
11 trial.'" Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)
12 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments). Procedurally,
13 under summary judgment practice, the moving party bears the initial responsibility of presenting
14 the basis for its motion and identifying those portions of the record, together with affidavits, if
15 any, that it believes demonstrate the absence of a genuine issue of material fact. Celotex, 477
16 U.S. at 323; Devereaux v. Abbey, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc). If the moving
17 party meets its burden with a properly supported motion, the burden then shifts to the opposing
18 party to present specific facts that show there is a genuine issue for trial. Fed. R. Civ. P. 56(e);
19 Anderson, 477 U.S. at 248; Auvil v. CBS "60 Minutes", 67 F.3d 816, 819 (9th Cir. 1995).

20       A clear focus on where the burden of proof lies as to the factual issue in question is crucial
21 to summary judgment procedures. Depending on which party bears that burden, the party seeking
22 summary judgment does not necessarily need to submit any evidence of its own. When the
23 opposing party would have the burden of proof on a dispositive issue at trial, the moving party
24 need not produce evidence which negates the opponent's claim. See e.g., Lujan v. National
25 Wildlife Fed'n, 497 U.S. 871, 885 (1990). Rather, the moving party need only point to matters
26 which demonstrate the absence of a genuine material factual issue. See Celotex, 477 U.S. at 323-
27 24 ("[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a
28 summary judgment motion may properly be made in reliance solely on the 'pleadings,

depositions, answers to interrogatories, and admissions on file.'"). Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. See id. at 322. In such a circumstance, summary judgment must be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment . . . is satisfied." Id. at 323.

To defeat summary judgment the opposing party must establish a genuine dispute as to a material issue of fact. This entails two requirements. First, the dispute must be over a fact(s) that is material, i.e., one that makes a difference in the outcome of the case. Anderson, 477 U.S. at 248 ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."). Whether a factual dispute is material is determined by the substantive law applicable for the claim in question. Id. If the opposing party is unable to produce evidence sufficient to establish a required element of its claim that party fails in opposing summary judgment. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex, 477 U.S. at 322.

Second, the dispute must be genuine. In determining whether a factual dispute is genuine the court must again focus on which party bears the burden of proof on the factual issue in question. Where the party opposing summary judgment would bear the burden of proof at trial on the factual issue in dispute, that party must produce evidence sufficient to support its factual claim. Conclusory allegations, unsupported by evidence are insufficient to defeat the motion. Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989). Rather, the opposing party must, by affidavit or as otherwise provided by Rule 56, designate specific facts that show there is a genuine issue for trial. Anderson, 477 U.S. at 249; Devereaux, 263 F.3d at 1076. More significantly, to demonstrate a genuine factual dispute the evidence relied on by the opposing party must be such that a fair-minded jury "could return a verdict for [him] on the evidence presented." Anderson, 477 U.S. at 248, 252. Absent any such evidence there simply is no reason for trial.

////

1   The court does not determine witness credibility.  It believes the opposing party's
2   evidence, and draws inferences most favorably for the opposing party.  See id. at 249, 255;
3   Matsushita, 475 U.S. at 587.  Inferences, however, are not drawn out of "thin air," and the
4   proponent must adduce evidence of a factual predicate from which to draw inferences.  American
5   Int'l Group, Inc. v. American Int'l Bank, 926 F.2d 829, 836 (9th Cir. 1991) (Kozinski, J.,
6   dissenting) (citing Celotex, 477 U.S. at 322).  If reasonable minds could differ on material facts at
7   issue, summary judgment is inappropriate.  See Warren v. City of Carlsbad, 58 F.3d 439, 441 (9th
8   Cir. 1995).  On the other hand, "[w]here the record taken as a whole could not lead a rational trier
9   of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  Matsushita, 475 U.S.
10  at 587 (citation omitted); Celotex, 477 U.S. at 323 (if the evidence presented and any reasonable
11  inferences that might be drawn from it could not support a judgment in favor of the opposing
12  party, there is no genuine issue).  Thus, Rule 56 serves to screen cases lacking any genuine
13  dispute over an issue that is determinative of the outcome of the case.
14  Defendants' motion for summary judgment included a so-called "Rand notice" (ECF No.
15  84-2) to plaintiff informing him of the requirements for opposing a motion pursuant to Rule 56 of
16  the Federal Rules of Civil Procedure.  See Woods v. Carey, 684 F.3d 934 (9th Cir. 2012); Rand v.
17  Rowland, 154 F.3d 952, 957 (9th Cir. 1998) (en banc), cert. denied, 527 U.S. 1035 (1999);
18  Klingele v. Eikenberry, 849 F.2d 409 (9th Cir. 1988).

19  **III.    Legal Analysis**

20  Defendants both move for summary judgment on the ground that the involuntarily
21  administered medications were necessary in an emergency situation to preserve life or prevent
22  harm.  Defendant Essex additionally moves on the ground that he is entitled to qualified
23  immunity.  For the reasons outlined below, the undersigned respectfully recommends that both
24  motions be denied.

25      **A.    Whether Emergency Necessitated Involuntary Medication**
26          **1.    Due Process Standard**
27  In Washington v. Harper, 494 U.S. 210 (1990), the Supreme Court instructed that a state
28  prisoner "possesses a significant liberty interest in avoiding the unwanted administration of

antipsychotic drugs under the Due Process Clause of the Fourteenth Amendment." Id. at 221. In a subsequent passage, the Supreme Court held that "given the requirements of the prison environment, the Due Process Clause permits the State to treat a prison inmate who has a serious mental illness with antipsychotic drugs against his will, if the inmate is dangerous to himself or others and the treatment is in the inmate's medical interest." Id. at 227. The Court held that Harper's substantive Due Process rights were met because the "proper use of [antipsychotic] drugs is one of the most effective means of treating and controlling a mental illness that is likely to cause violent behavior." Id. at 226. The inmate in Harper "was involuntarily medicated for about one year." Id. at 217.

The Court also rejected Harper's claim that his procedural due process rights were violated because a judicial hearing was not conducted as a prerequisite for his involuntary treatment. Id. at 228. The Court concluded that the procedure adopted by the state of Washington that required that an administrative hearing be held to determine whether the decision made by a medical professional to administer an antipsychotic medication if an inmate suffers a mental disorder and is "dangerous to himself, others, or their property" satisfied procedural due process protections. Id. at 232-233.

In Kulas v. Valdez, 159 F.3d 453 (9th Cir. 1998), the Ninth Circuit inferred that the due process procedural requirements described in Harper are not applicable when an emergency exists requiring the involuntary administration of an antipsychotic medication. Citing Hogan v. Carter, 85 F.3d 1113 (4th Cir. 1996), the Ninth Circuit noted that "[t]here is no evidence that Kulas posed such an imminent and serious danger to himself or others that the minimal procedural requirements of Harper-notice and right to be present at and participate in a hearing-could not be met." 159 F.3d at 456.

In Hogan, a doctor "personally familiar with Hogan, his mental disorder, and his prior treatment, determined, pursuant to and consistent with accepted professional judgment, that it was in Hogan's medical interest to receive the one-time dose of Thorazine in order to protect Hogan from imminent, self-inflicted harm." Id. at 1117 (citation omitted). The Fourth Circuit reversed the district court's decision denying the doctor's motion to dismiss and remanded the matter with

10

instructions to enter judgment for the doctor.  Id. at 1118.  The Fourth Circuit commented:

> If Dr. Carter had not ordered the single dose of Thorazine that he did order, and instead delayed emergency medical intervention until after Hogan had been afforded the predeprivation hearing to which the district court held Hogan was entitled, it is not unlikely that Dr. Carter would now be facing a lawsuit by Hogan claiming that he was deliberately indifferent to his serious medical needs. That Dr. Carter should not be liable for taking the very action, the failure of which to take could have exposed him to such a lawsuit, should come as no surprise.

Id. at 1118-19.

In Kulas, the Ninth Circuit noted that the inmate-patient was "merely loud and uncooperative." 159 F.3d at 456.  Here, plaintiff raises a question of material fact as to whether he was also merely loud and uncooperative, rather than an "imminent and serious danger to himself or others." Id.

As an aside, the undersigned notes that both defendants cite to California law allowing for involuntarily medicating an inmate in an emergency, which is defined as "a sudden, marked change in an inmate's condition so that action is immediately necessary for the preservation of life or the prevention of serious bodily harm to the inmate or others, and it is impracticable to first obtain consent." Cal. Code. Regs., tit. 15, § 3351(a).  The court acknowledges this code, but also recognizes that it must be followed according to the due process standards explained above.  Thus, the below analysis focuses on due process rather than the code.

### 2.  Application to Defendant Essex

It is undisputed that defendant Essex administered five (5) mg of Holdol, two (2) mg of Ativan, and fifty (50) mg of Benadryl at 12:30 PM on March 18, 2012.  (ECF No. 68 at 128.)  In the medical records, defendant Essex assessed plaintiff as "angry, hyperverbal, agitated, poor impulse control" at the time of the involuntary medicating.  (Id.)  It also undisputed that plaintiff refused cell searches, refused medication, refused participation in the programming of the APP, and smeared food and feces around his cell before being brought to defendant Essex.  (Id. at 125-29.)  Defendant Essex viewed plaintiff's risk of violence as "high in view of current behavior and history of intentional wounding of law enforcement officers and escape from a forensic hospital."

1   (Id. at 126.) Defendant Essex also noted that plaintiff's risk of self-harm was "high due to
2   disregard for his own well-being by refusing chronic care medications." (Id.)

3   While this behavior is certainly concerning, what is noticeably absent from the record is
4   evidence that plaintiff was actually suicidal, homicidal, or violent at the time the medication was
5   administered. The "history" defendant Essex refers to all occurred years before the incident in
6   this case. The escape to which defendant Essex refers took place in 1989. Defendant Essex also
7   relies upon plaintiff's refusal to take medication and his aggressive, angry, and volatile state to
8   justify the administration of medication involuntarily. However, plaintiff's sworn declaration
9   states that he was angry about his placement in the APP and was doing all that he could to be
10  transferred out. (Id. at 9-19.) Plaintiff denies that he was suicidal, homicidal, or threatening
11  violence to anyone.

12  Plaintiff has offered an explanation that paints the situation in March 18, 2012 as driven
13  by protest, not emergency. While plaintiff's form of protest (smearing food and feces in his cell)
14  is certainly unconventional, it nonetheless raises a question of fact as to whether there really was
15  an emergency necessitating immediate involuntary medication. Plaintiff claims that he thought
16  he was being brought to a long-term treatment facility, not the APP. (Id. at 10.) When he
17  realized that he was to be housed at the APP for a second time in two months, he demanded to be
18  returned to prison. (Id.) When he was not returned, he refused to participate in the program and
19  decided to remain in his cell until he was transferred out of the APP. (Id.)

20  On March 18, 2012, plaintiff claims that he had a dispute with the APP staff concerning
21  their refusal to feed him unless he consented to a cell search. (Id. at 11.) He claims that this
22  alleged violation of state regulations upset him and when the supervising nurse took no action
23  concerning his complaint (and, thereafter, no one came to provide him with food), plaintiff
24  smeared feces on his cell door as a means of gathering attention. (Id.) Plaintiff was then brought
25  to defendant Essex for an assessment. He claims that he explained his problems to defendant
26  Essex, but that defendant Essex responded by asking him about mental health problems from his
27  past. (Id.) At that point, defendant Essex signed the order to involuntarily medicate plaintiff.
28  ////

In plaintiff's explanation, which is not blatantly contradicted by any of the medical files on record, there is clearly no emergency situation which would necessitate the extreme intervention of involuntarily medicating an inmate. Clearly, plaintiff's behavior was aggressive, loud and uncooperative, and his means of expression unconventional, however, the evidence is not clear that a doctor in defendant Essex's position would reasonably believe that the situation was so dire as to require medicating the patient without the patient's consent.

As explained above, the Ninth Circuit has inferred that an inmate may be medicated against his will where the inmate is "such an imminent and serious danger to himself or others that the minimal procedural requirements of Harper-notice and right to be present at and participate in a hearing-could not be met." Kulas, 159 F.3d at 456. The record of the situation defendant Essex faced on March 18, 2012, does not, as a matter of law, arise to establishing an emergency. Plaintiff's explanation of the incident, plus the absence of compelling evidence of suicidal or homicidal threats from plaintiff, raise questions of material fact that must be assessed by a jury. Accordingly, the undersigned recommends that defendant Essex's motion be denied on this ground.

### 3. **Defendant Banyas**

It is undisputed that defendant Banyas administered five (5) mg of Haldol and twenty-five (25) mg of Benadryl on April 4, 2012. It also undisputed that plaintiff refused cell searches, refused medication, refused participation in the programming of the APP, and smeared food around his cell before being brought to defendant Banyas. (ECF No. 68 at 80.) Defendant Banyas noted that plaintiff was "very argumentative and angry." (Id.) Plaintiff allegedly became "even more agitated as [the treatment] team attempted to engage him in meaningful conversation. (Id.) Plaintiff apparently became "verbally aggressive" as well. (Id.) Defendant Banyas does not provide documentation concerning any specific threats of harm to plaintiff, himself, or others.

As with the March 18, 2012 incident, this behavior is certainly concerning; however, what is noticeably absent from the record is evidence that plaintiff was actually suicidal, homicidal, or violent at the time the medication was administered. Defendant Banyas relies upon plaintiff's history, refusal to take medication, and his aggressive, angry, and volatile state to justify the

13

administration of medication involuntarily.  However, plaintiff's sworn declaration states that he was angry about his placement in the APP and was doing all that he could to be transferred out. (Id. at 9-19.)  Plaintiff denies that he was suicidal, homicidal, or threatening violence to anyone.

Plaintiff has offered an explanation that, again, paints the situation on April 4, 2012 as driven by protest, not emergency.  Specifically, plaintiff claims that his breakfast tray was thrown at him in his cell that morning, landing on the floor and on his mattress where he was seated.  (Id. at 15.)  Plaintiff then knocked on his cell door loudly to get the attention of the supervising nurse. However, no one responded to plaintiff's knocking, so he claims that it became necessary to smear his food on the window of the cell "to block vision into the cell/room requiring a supervisory staff to come and investigate."  (Id.)

By plaintiff's account, his tactic was successful, bringing a nurse and sergeant to his cell where he was able to explain his problem to them. (Id. at 15-16.)  Plaintiff was then brought to the dayroom where he first discussed his issues with the sergeant before defendant Banyas arrived.  As with defendant Essex, plaintiff claims that he was merely trying to express his protestations to defendant Banyas and the treatment team.  (Id. at 16.)  Eventually, during this interaction, plaintiff claims that defendant Banyas got frustrated and signed the order to involuntarily medicate plaintiff.  (Id.)

In plaintiff's explanation, which is not blatantly contradicted by any of the medical files on record, there is clearly no emergency situation which would necessitate the extreme intervention of involuntarily medicating an inmate.  Clearly, plaintiff's behavior was aggressive, loud and uncooperative, and his means of expression unconventional, however, the evidence is not clear that a doctor in defendant Banyas' position would reasonably believe that the situation was so dire as to require medicating the patient without the patient's consent.

An inmate may be medicated against his will where the inmate is "such an imminent and serious danger to himself or others that the minimal procedural requirements of Harper-notice and right to be present at and participate in a hearing-could not be met."  Kulas, 159 F.3d at 456. Plaintiff's explanation of the incident, plus the absence of compelling evidence of suicidal or homicidal threats from plaintiff, raise questions of material fact that must be assessed by a jury.

14

1    Accordingly, the undersigned recommends that defendant Banyas' motion be denied on this
2    ground.

3          **B.**      **Qualified Immunity**

4    Defendant Essex separately argues that he is entitled to qualified immunity. For the
5    following reasons, the undersigned finds that defendant Essex is not entitled to qualified
6    immunity.

7    In analyzing the qualified immunity defense, the court looks at the facts in the light most
8    favorable to plaintiff. Johnson v. Bay Area Rapid Transit Dist., 724 F.3d 1159, 1168 (9th Cir.
9    2013). "To determine whether an officer is entitled to qualified immunity, a court must evaluate
10   two independent prongs: (1) whether the officer's conduct violated a constitutional right, and (2)
11   whether that right was clearly established at the time of the incident. . . . These prongs may be
12   addressed in either order." Castro v. County of Los Angeles, 797 F.3d 654, 663 (9th Cir. 2015)
13   (citing Pearson v. Callahan, 555 U.S. 223, 232, 236 (2009)).

14   "To determine that the law was clearly established, we need not look to a case with
15   identical or even 'materially similar' facts." Serrano v. Francis, 345 F.3d 1071, 1077 (9th Cir.
16   2003) (quoting Hope v. Pelzer, 536 U.S. 730, 739–41 (2002)). The question instead is whether
17   the contours of the right were sufficiently clear that a reasonable official would understand that
18   his actions violated that right. Id.; see also Saucier v. Katz, 533 U.S. 194, 202 (2001).

19   The court, in assessing the merits of defendants' summary judgment motion above,
20   already found that plaintiff has established genuine issues of material fact concerning whether his
21   Fourteenth Amendment rights were violated by defendant Essex's administration of medication to
22   plaintiff without his consent. (See supra, pp. 11-13.) Thus, defendant Essex is not entitled to
23   qualified immunity under the first prong of the qualified immunity test.

24   Concerning the second prong, defendant Essex claims that he is entitled to qualified
25   immunity because it was not clearly established what circumstances constitute an emergency and
26   when medication is necessary to prevent serious bodily harm. (ECF No. 64-1 at 24.) While the
27   Ninth Circuit case law is not particularly clear on this point, as evidenced by the emergency
28   exception only being **inferred** as the law of the circuit, it is clear enough to state that an inmate

must pose such an "imminent and serious danger to himself or others that the minimal procedural requirements of Harper-notice and right to be present at and participate in a hearing-could not be met." Kulas, 159 F.3d at 456.

In this case, plaintiff explains that he was merely protesting his transfer to the APP when he acted out against the unit rules and correctional staff. The record indicates very little violent activity, and furthermore, indicates no actual threats of violence or suicide. If a fact finder were to adopt plaintiff's perspective of the incident, it would be readily apparent that a clearly established right was being violated. Specifically, where an inmate is protesting his treatment, even unconventionally, and explains his position to the treatment team without raising any hints at self-harm or violence to others, such a situation clearly would not invoke threats of "imminent and serious danger." See Kulas, 159 F.3d at 456.

At this summary judgment stage of the proceedings, the court is entitled to view the evidence in the light most favorable to plaintiff. Johnson, 724 F.3d at 1168. The undisputed facts here are that plaintiff -- an inmate with a past history of suicide attempts and violence towards correctional staff more than five years before the incident in question -- was uncooperative with his treatment program, refused medication, and acted out against his confinement at the APP. Plaintiff submitted a sworn statement claiming that this behavior was specifically targeted at protesting his treatment. (ECF No. 68 at 9-19.)

Thus, based upon this evidence, the court cannot conclude that a doctor facing this situation -- i.e., a doctor addressing a uncooperative inmate protesting the conditions of his confinement through unconventional means -- would be reasonable in injecting the inmate with psychotropic drugs against the inmate's will. Accordingly, the undersigned recommends denying defendant Essex's claim of qualified immunity.

## IV.     Conclusion

For the foregoing reasons, IT IS HEREBY RECOMMENDED that defendants' motions for summary judgment (ECF Nos. 63; 64) be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within fourteen days

after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the objections shall be filed and served within seven days after service of the objections.[2]  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

Dated: March 9, 2017

DEBORAH BARNES
UNITED STATES MAGISTRATE JUDGE

TIM-DLB:10
DB / ORDERS / ORDERS.PRISONER.CIVIL RIGHTS / wash.3054.msj

---

[2] Local Rule 304 provides the court with discretion to shorten deadlines concerning objections to findings and recommendations.  The undersigned is exercising that discretion with regard to the response to any objections because this is a straightforward matter and the issues have been comprehensively briefed.